UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PEOPLE FOR THE ETHICAL TREATMENT OF
ANIMALS, INC.,

Plaintiff,

v.

DADE CITY'S WILD THINGS, INC., STEARNS
ZOOLOGICAL RESCUE & REHAB CENTER,
INC. D/B/A DADE CITY'S WILD THINGS,
KATHRYN P. STEARNS, AND RANDALL E.
STEARNS,

Defendants.

Case No.: 8:16-cv-2899-CEH-AAS

**Request for Oral Argument and
Evidentiary Hearing**

## EMERGENCY MOTION FOR PRESERVATION ORDER AND
## ORDER TO SHOW CAUSE WHY JOSEPH MALDONADO, JEFFREY LOWE,
## AND THE GREATER WYNNEWOOD EXOTIC ANIMAL PARK
## <u>SHOULD NOT BE HELD IN CONTEMPT</u>

Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") moves for:

(1) an emergency preservation order, effective until the final disposition of this motion, directing

Joseph Maldonado (aka Joe Schreibvogel or Joe Exotic) ("Maldonado"), Jeffrey Lowe ("Lowe"),

and the Greater Wynnewood Exotic Animal Park ("Wynnewood") to preserve all evidence

relating to the tigers transferred from Dade City's Wild Things ("DCWT") to Wynnewood, and

further preserve the tigers so that they cannot be transferred, transported (or otherwise relocated),

or killed, commingled with other tigers, hand-reared, used for breeding, or subjected to direct

contact with humans; and (2) an order to show cause why Maldonado, Lowe, and Wynnewood

are not in contempt for aiding and abetting the violation of the Court's Orders, (ECF Nos. 63

& 69) ("July Orders"), requiring that Defendants make their tigers available to PETA for

inspection and mandating that these tigers not be transferred, transported, relocated, or in any

way harmed. PETA requests that the Court hold oral argument and an evidentiary hearing on this

motion and on PETA's sanctions motion against DCWT (ECF No. 76), and estimates six (6) hours for such a hearing.

An emergency preservation order is necessary to protect the tigers because Maldonado and Lowe have explicitly stated they will kill the tigers before they are transferred to The Wild Animal Sanctuary, Inc. ("TWAS")—the world's oldest and largest nonprofit sanctuary for captive wildlife—or to any reputable sanctuary accredited by the Global Federation of Animal Sanctuaries ("GFAS"). A preservation order is also necessary to protect the tigers from the harm they face by virtue of Wynnewood's well-documented history of failing to provide the minimal level of care required by law. As recently as May, 2017, the United States Department of Agriculture ("USDA") cited Wynnewood for failing to properly contain a tiger, resulting in Wynnewood killing the escaped tiger. A preservation order is also required to protect these tigers from the very practices that PETA challenged at the DCWT facility. *See* ECF No. 37.

Since PETA is asking the Court to order the tigers transferred to TWAS, both here and in the pending DCWT sanctions motion (ECF No. 76), the tigers are in palpable danger of being killed, and the Court must issue an emergency preservation order to protect and preserve them. As set forth further below, any such preservation order must hold Maldonado, Lowe, and Wynnewood—and their employees, volunteers and agents—personally accountable if Wynnewood should move the DCWT tigers absent further order of the Court, or violate the Court's order in any other way.

To establish that a finding of contempt against Maldonado, Lowe, and Wynnewood is proper for their part in aiding and abetting DCWT's violation of the Court's July Orders, PETA requests an evidentiary hearing to allow the contemnors the opportunity to provide testimony so the Court may make the requisite credibility determinations.

2

## MEMORANDUM OF LAW

## I.     INTRODUCTION

DCWT's extraordinary efforts to hastily relocate their tigers in defiance of the Court's July Orders demonstrate unequivocally its contempt for this Court—but DCWT did not act alone. DCWT's violation of the Court's July Orders would not have been possible but for the knowing assistance of their various co-conspirators, including Kenneth Stearns,[1] Maldonado (Wynnewood's founder), and Lowe (Wynnewood's CEO). These co-conspirators have so thoroughly injected themselves into this litigation that they operate as shadow parties whose sole purpose is to prejudice PETA. This they have accomplished in part by aiding and abetting DCWT's violation of the July Orders—a conspiracy that caused the death of three tiger cubs, spoliated crucial evidence in this case, and attempted to deprive PETA of the relief it seeks.

Clear and convincing evidence demonstrates that DCWT's co-conspirators knew about PETA's Endangered Species Act ("ESA") citizen-suit against DCWT. They knew that DCWT's tigers were the focus of PETA's lawsuit to spare the tigers further "harm" or "harassment." They knew, by July 12, 2017, that the Court had ordered a July 20, 2017, Site Inspection of DCWT so that PETA could inspect the tigers at DCWT. And they agreed to receive those tigers in order to undermine that very site inspection.

That DCWT and Wynnewood conspired to accomplish this objective is not surprising. They are cut from the same cloth. Both breed tigers to separate newborn cubs from their mothers for use in lucrative public encounters. Both hate PETA intensely. Both routinely violate the federal Animal Welfare Act ("AWA"), so much so that the USDA, which administers the AWA, has taken rare enforcement action against them, levying fines and ordering both of their licenses

---

[1]     To avoid confusion and provide greater clarity, PETA will be filing a separate motion with regard to Kenneth Stearns' conduct in violating the July Orders.

temporarily suspended. The only appreciable differences between the two are that Wynnewood's operation is larger and only DCWT offers tiger cub swim encounters.

Because DCWT did not act alone in violating this Court's July Orders, the relief PETA seeks against DCWT in its sanctions motion (ECF No. 76) is not sufficient to make PETA or this Court whole. To accomplish that purpose, this Court can—and must—exercise its inherent authority and issue an order to show cause why Maldonado, Lowe, and Wynnewood should not be held in contempt as aiders and abettors to DCWT. When it finds them in contempt, this Court can and should order Maldonado and Lowe imprisoned until they purge themselves of that contempt by arranging for the immediate[2] and permanent[3] transfer of the tigers to TWAS.

PETA filed suit against DCWT to protect these tigers and seek appointment of a guardian ad litem to ensure the relief granted would be consistent with the tigers' best interest. Having moved the tigers, DCWT, Maldonado, Lowe, and Wynnewood believe they successfully thwarted PETA's suit. They are mistaken. Their contempt did nothing to strip this Court of its jurisdiction over this case, over the evidence that is central to this matter, or over the parties and non-parties who conspired to violate this Court's orders. By its conduct, DCWT did not just physically release the tigers to Wynnewood, it forfeited the right to have any say where the tigers live out the remainder of their lives. Likewise, by receiving the tigers in knowing violation of this Court's July Orders, after aiding and abetting DCWT in violating these orders, and by threatening to kill the tigers should the Court issue further orders they disagree with, Maldonado, Lowe, and Wynnewood forfeited their right to possess these tigers, as described herein.

---

[2]    The transport of any pregnant or nursing tigers and/or their cubs may need to be delayed pending an expert's determination that they are fit to travel. DCWT and Wynnewood's conspiracy to relocate the tigers—knowing pregnant tigers were among the 19 delivered to Wynnewood—resulted in the death of three tiger cubs born en route to Oklahoma.
[3]    The transfer must be permanent as an interim transfer would not be in the best interests of the tigers.

6170984.1

A clearer case of spoliation and contempt could not be made. But for Maldonado, Lowe, and Wynnewood, DCWT would not have been able to effectuate its scheme to "outsmart" PETA by removing the tigers because—in the words of co-conspirator Kenneth Stearns—"With no tigers, how they gonna prove tiger abuse?" *See* Exh. 1, Justin Cochran Declaration ("Cochran Decl."), ¶ 3(a), Video 1 (03:05-03:20); transcribed and attached as Exh. 3 at 4:3-6 ("I get that they're losing but you can't win them all including them. You know, even with all their money and us broke, sometimes somebody outsmarts your ass."); *see also* Cochran Decl., ¶ 3(b), Video 2 (12:11-12:20); transcribed and attached as Exh. 4 at 10:11-13 ("They know they ain't got nothing. With no tigers, how they gonna prove tiger abuse?").

To correct these transgressions, this Court should not only hold DCWT in contempt (ECF No. 76), but also hold Maldonado, Lowe, and Wynnewood in contempt as well. Alternatively, the Court may simply order Maldonado, Lowe, and Wynnewood to arrange for the immediate and permanent transfer of the tigers to TWAS, and if they refuse to do so, then take the next step toward contempt and sanctions. As explained below, the Court has both the power and the jurisdiction over Maldonado, Lowe, and Wynnewood to accomplish this end.

## II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.     This Court's July Orders were Violated When Wynnewood Acquired Nineteen Tigers That Were Hastily Relocated from Florida to Oklahoma.

On July 12, 2017, the Court ordered DCWT to make its facilities and tigers available to PETA for inspection on July 20, 2017. (ECF No. 63). On July 14, 2017, the Court explicitly prohibited the transfer, transport, relocation, or harm of DCWT's tigers. (ECF No. 69).

Two days later, on July 16, 2017, a double decker cattle trailer packed with nineteen of DCWT's twenty-four tigers arrived at Wynnewood, located in Oklahoma. *See* Exh. 5, Tracey McManus, "Dade City's Wild Things moves tigers to Oklahoma during court battle with PETA,"

5

Tampa Bay Times (July 17, 2017) (confirming the tigers' arrival at Wynnewood);[4] ECF No. 76-9, Declaration of Jay Pratte ¶¶ 9-13 (discussing video of Maldonado unloading the tigers from the cattle trailer); Cochran Decl., ¶ 3(c) and ¶ 4, Exh. 1-2 at 400028-31 (transfer form and certificates of veterinary inspection dated July 14, 2017).

Inside the trailer were the bodies of three dead tiger cubs born during the 1200-mile trip from Florida to Oklahoma. *See* ECF No. 76-9, Pratte Decl., ¶ 13 (discussing dead cubs); Cochran Decl., ¶ 3(d), Video 4 (7:05-7:52) (filming the dead cubs, Maldonado remarked, "I want to show you what f--king PETA is responsible for, for suing this lady and making her get rid of these tigers. . . . Because they forced this woman to move these cats . . . she had every one of those babies in this trailer . . . they're dead. Three dead cubs at the hands of f--king PETA."); ECF No. 76-4 (map of distance between DCWT and Wynnewood).

Four days prior, on July 12, 2017—the same day this Court granted PETA's Motion to Compel Entry Upon Land and Site Inspection (ECF Nos. 56 & 63)—Maldonado, Wynnewood's founder, exchanged text messages with Lowe, Wynnewood's CEO,[5] stating that evening, "Peta won in court today." Cochran Decl., ¶ 4, Exh. 1-2 at 400023-27. According to Maldonado, Kathy Stearns told him she "needed to get rid of her tigers" because of "a lawsuit with PETA" and she asked him to "take the cats until she figured something out." Exh. 5, Tampa Bay Times.

Maldonado confirmed his knowledge to PETA during a voluntary July 26, 2017, telephone interview wherein he openly admitted that he and "everybody in the business" knew Kathy Stearns was having trouble with PETA, and that he knew that PETA had sued DCWT. *See*

---

[4]     *Available at* http://www.tampabay.com/news/environment/wildlife/dade-citys-wild-things-moves-tigers-to-oklahoma-during-court-battle-with/2330691.
[5]     *See* Exh. 6, Brianna Bailey, "OKC Officials Investigate Bear, Tiger Petting Zoo," News OK (June 15, 2017), http://newsok.com/article/5552904 (identifying Maldonado as Wynnewood's founder and noting Maldonado sold Wynnewood to Lowe in 2016).

Exh. 7, Jim Orr Declaration ("Orr Decl."), ¶ 11. He further said that Kathy Stearns told him PETA had won in court and there would be a site inspection of DCWT, and that she had to get rid of the tigers. *Id*. Maldonado believed Stearns was embarrassed about the tigers' condition. *Id*.

On June 21, 2017, Lowe referred to Brittany Peet, counsel to PETA, as "delusional" and "a misleading, lying c-nt" and, to substantiate his vulgar attack, he linked to an article referencing PETA's "pending lawsuit against [DCWT], alleging that encounters like the tiger swim violate the Endangered Species Act." Cochran Decl., ¶ 5(a), Post 1. That same day, Lowe made a related post admitting his intentional interference in this suit, telling PETA "You dumbasses have run into the guy here that will stop you from terrorizing people that conduct legal activities. . . . I can't wait to meet you . . . inside a courtroom." *Id*. at ¶ 5(m), Post 13. Six days later, Maldonado expressed a similar sentiment. *Id*. at ¶ 5(n), Post 14 (he is "ready for this dog fight" "over these 19 tigers" and wants to "finally gets some of this sh-t out in federal court.").

There is no dispute that Maldonado and Lowe knew of PETA's lawsuit against DCWT, knew the Court had ordered PETA's site inspection at DCWT, and agreed to "take the cats until she figured something out." Orr Decl., ¶ 11. Pursuant to that illegal agreement, Kenneth Stearns, DCWT's Vice President[6] and Kathy Stearns' husband, loaded nineteen of DCWT's tigers into the cattle trailer, which arrived at Wynnewood on July 16, 2017—four days after the Court's July 12 Order and two days after the Court's July 14 Order. (ECF Nos. 63 & 69) Maldonado's and Lowe's knowledge, coupled with their act of taking the tigers from DCWT, establishes their role as DCWT's aiders and abettors in violating the July Orders.

---

[6]    *See* Exh. 8, Sunbiz.org, Detail by Entity Name, Dade City's Wild Things, Inc. (listing "Stearns, Kennath" [sic] as Vice President of DCWT's not for profit corporation, which was voluntarily dissolved earlier this year in response to a pending investigation by the Florida Department of Agriculture for suspected charitable fraud).

**B.**     **Maldonado's and Lowe's Other Conduct Further Demonstrates That They Are Acting in Concert with DCWT to Spoliate Evidence and Make a Mockery of this Court's Proceedings.**

There is no question that Maldonado and Lowe are acting in concert with and as DCWT proxies to prejudice PETA. No other reasonable explanation exists as to why Maldonado and Lowe—non-parties to this lawsuit against DCWT—have gone to remarkable lengths to undermine this proceeding. Their conduct establishes that they are anything but innocent bystanders here.

Indeed, since they took the tigers from DCWT, Maldonado has repeatedly threatened to kill them in lieu of transferring them to TWAS. Orr Decl., ¶ 12; *see also* Cochran Decl., ¶ 5(b), Post 2 (commenting "I would euthinize [sic] them all before they went to pat craig or bcr"); Exh. 9, Tracey McManus, "PETA inspects Dade City's Wild Things but welfare of tigers still in question", Tampa Bay Times, (Aug. 4, 2017).[7] Lowe agrees. Cochran Decl., ¶ 5(i), Post 9 ("TRUE, TRUE, TRUE: But he said he would "euthanize them before they go to Pat Craig," because of objections to his work with PETA and conditions of his facility."). To conceal the tigers from PETA and this Court, Lowe has also threatened to commingle the DCWT tigers with other tigers at Wynnewood—even after PETA notified Oklahoma attorney Justin Meek that Wynnewood could not commingle the DCWT tigers with Wynnewood's other tigers. *See* Exh. 10, July 20, 2017 Letter from M. Hasbun;[8] Cochran Decl., ¶ 5(c), Post 3 (commenting "I think it's time to move 19 of our tigers in with 19 Florida tigers. Let the expert, Jay Pratte sort

---

[7]     *Available at* http://www.tampabay.com/news/environment/wildlife/peta-inspects-dade-citys-wild-things-but-welfare-of-tigers-still-in/2332750.

[8]     In a July 17, 2017, e-mail to Marcos Hasbun, Lowe copied Oklahoma attorneys Justin Meek and Melanie Christians. *See* Cochran Decl., ¶ 7. Preliminary discussions ensued with Mr. Meek relative to the DCWT tigers at Wynnewood, but Mr. Meek and Ms. Christians later advised the undersigned they would not be representing Lowe, Maldonado or Wynnewood in connection with this matter.

them out."); *see also* Exh. 11, Jay Pratte Declaration ("Pratte Decl."), ¶¶ 7-16 (detailing Maldonado's and Lowe's "online "smear" campaign" and the resulting impact).

Such commingling would frustrate PETA's ability to obtain the judgment it seeks, not least of all because PETA could be forced to examine more than 200 big cats at Wynnewood to identify the DCWT tigers. Exh. 5, Tampa Bay Times (Wynnewood confines 246 lions and tigers on 54 acres). Troublingly, recent video evidence suggests Maldonado may have begun commingling the tigers. *See* Cochran Decl., ¶ 3(e), Video 5 (Pearl, identified as a DCWT tiger, is interacting with tigers who are apparently named Rocky, Sasha, and Merlin); Cochran Decl., ¶ 4, Exh. 1-2 at 400029-31 (transport paperwork shows DCWT sent Wynnewood tigers named Pearl and Rocky, but none named Sasha or Merlin).

Even more extraordinary, to further prejudice PETA, these shadow parties have engaged in a campaign to harass and attempt to intimidate Jay Pratte, PETA's expert witness, who submitted a declaration filed with this Court in connection with PETA's motion for sanctions against DCWT. (ECF No. 76-9). *See* Exh. 11, Pratte Decl., ¶¶ 7-16 (describing harassment); Cochran Decl., ¶ 5(c)-(j), Posts 3-10. Shortly after Pratte's first declaration was filed with this Court, Maldonado and Lowe urged their followers on Facebook to harass Mr. Pratte. *See* Pratte Decl., ¶ 7 (harassment began two days after first declaration was filed); *see also* Cochran Decl., ¶ 5(d), Post 4 (posting, "Please help me prove that PeTA's big cat expert is what I think he is. . . . Let's get this clown on perjury. . . . If anyone is bored and would like to research this Omaha zoo employee that thinks he's Steve Irwin," and commenting about calls Lowe made to Mr. Pratte's former employers) and ¶ 5(e), Post 5 (commenting "their text book expert that thinks he knows what is happening in a video has no CLUE . . . in one sentence they say they are solitaire [sic]

6170984.1

animals, next sentence they want them all living one compound at pat craigs. Make up your f--king mind").

Lowe's wife, Lauren Dropla, openly harassed Mr. Pratte by engaging in an outright fraud. On July 28, 2017, she called Mr. Pratte's current employer and falsely stated that Mr. Pratte was looking for work elsewhere. *See* Pratte Decl., ¶ 16 and Exh. 11-2 (call log showing Dropla told Mr. Pratte's employer that he had applied for a position in "behavioral husbandry" at the "Oklahoma Zoo"); *see also* Exh. 12, Accurint Phones Plus Search Results (Aug. 9, 2017) (phone number listed on call log is the possible cell phone of Lauren Dropla of Wynnewood, Oklahoma); Exh. 13, "Lauren Dropla, Jeffrey Lowe marry in Las Vegas, The State (July 23, 2017). This call, and those placed by Lowe to Mr. Pratte's former employers "created the perception that [Mr. Pratte is] unhappy with [his] current employers," which "resulted in peers and colleagues questioning" his dedication and integrity. Pratte Decl., ¶ 16.

Mere bystanders, acting independently of a party to a litigation do not engage in such conduct. Rather, Maldonado, Lowe, and Wynnewood have taken every opportunity to act in concert with DCWT, beginning with the moment they agreed to take the DCWT tigers, knowing DCWT wanted to relocate the tigers to undermine the Court-ordered site inspection. Boasting about this subterfuge, Kenneth Stearns explained DCWT's and Wynnewood's motivations best: "With no tigers, how they [PETA] gonna prove tiger abuse?" Cochran Decl., ¶ 3(b), Video 2, (12:11-12:20); Exh. 4, Transcript, 10:12-13.

Meanwhile, Maldonado and Lowe have broadcast their intentions to interfere with this case. *See*, *e.g.*, Cochran Decl., ¶ 5(c), Post 3 ("Lets [sic] see you explain [wanting to move pregnant tigers] to an Oklahoma judge"), ¶ 5(m), Post 13 (wanting to meet PETA "inside a courtroom"), and ¶ 5(n), Post 14 ("you have drug the wrong dog in this dog fight over these

6170984.1

19 tigers . . . let's finally get some of this sh-t out in federal court."). DCWT even let Lowe speak for them in a joint notice to this Court, expressing Lowe's position on the proper disposition of the tigers in place of their own. *See* ECF No. 89 (Lowe asserts that the tigers "will not be going anywhere especially Pat Craig's facility in Colorado or any other GFAS facility for that matter.").

Likewise, they have made clear their intentions to further spoliate the evidence by breeding the tigers and hand-rearing and exhibiting the resulting cubs, and both Maldonado and Lowe have had direct contact with the adult tigers, a practice that places the tigers at risk of injury or death as they could be shot if they attack a person or attempt an escape. *See* Cochran Decl., ¶ 5(k)-(l), Posts 11-12 (Maldonado and Lowe having direct contact with the DCWT tigers). The facility has been repeatedly cited by the Occupational Safety and Health Administration ("OSHA") for allowing employees to have direct contact with big cats and other predators. *See* Exh. 14, OSHA Citation and Notification of Penalty (Nov. 9, 2016). Earlier this year a Wynnewood tiger was shot and killed after she escaped. Exh. 15, USDA Inspection Report (May 30, 2017). This was just one of many citations in Wynnewood's well-documented history of AWA violations. *See* ECF No. 67 (Wynnewood has been cited repeatedly by the USDA and is currently under investigation for the deaths of dozens of tiger cubs, and, in a rare enforcement action, was fined $25,000 and had its license suspended).

## III.  LEGAL ANALYSIS

### A.  The Court May Hold Non-Parties Who Aid and Abet the Violation of its Orders in Civil Contempt.

DCWT and its co-conspirators intentionally derailed this case and thrust it into a complete state of disarray such that the Court must take action to restore order by requiring Maldonado, Lowe, and Wynnewood to show cause why they should not be held in civil

contempt.[9] Pursuant to their "inherent authority, courts may impose fines or prison for contempt and enforce 'the observance of order.'" *Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 518 (D. Md. 2010).[10]

This Court "has a wide discretion in its choice of sanctions" and is empowered to issue them "to protect the due and orderly administration of justice and maintain the authority and dignity of the court." *Goya Foods, Inc. v. Wallack Mgmt.* Co., 290 F.3d 63, 77-78 (1st Cir. 2002). The fact that Maldonado, Lowe, and Wynnewood "[a]re not part[ies] to [the underlying action] against [DCWT] does not inoculate them against charges of civil contempt." *Id.* at 75. "Nonparties may be held liable for civil contempt notwithstanding their nonparty status" because "[i]t has long been recognized that a nonparty may be held in civil contempt if, and to the extent that, he knowingly aids or abets an enjoined party in transgressing a court order." *Goya Foods, Inc.*, 290 F.3d. at 75; *see, e.g.*, *S.E.C. v. Homa*, 514 F.3d 661, 674 (7th Cir. 2008) ("If courts did not have the power to punish [non-parties] who cooperate with those named in an injunction, the named parties could easily thwart the [court's order] by operating through others.").

---

[9]     The Court may also consider holding them in criminal contempt. However, unlike DCWT, which, as discussed in PETA's sanctions motion against DCWT (ECF No. 76) can do nothing at this point to purge itself of its contempt, meaning criminal contempt is an appropriate measure, Maldonado, Lowe, and Wynnewood have the opportunity to surrender the tigers and thereby purge themselves of the contempt they have placed themselves in by knowingly aiding and abetting DCWT in the violation of the Court's July Orders.

[10]     In *Stanley*, the Court ordered a party contemnor "be imprisoned for a period not to exceed two years, unless and until he pays to Plaintiff the attorney's fees and costs that will be awarded" to remedy his "pervasive and willful violation of serial Court orders to preserve and produce . . . evidence." 269 F.R.D. at 500. *See also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994) ("The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command such as an order 'to pay alimony, or to surrender property, . . . or to make a conveyance.'"); *In re Dinnan*, 625 F.2d 1146, 1149 (5th Cir. 1980) ("A fixed term of imprisonment, with the proviso that the contemnor will be released if he complies with the court order, is a proper penalty for civil contempt and the imposition of such a penalty does not make the proceeding criminal . . . .").

6170984.1

As discussed, Maldonado, Lowe, and Wynnewood were acutely aware that on July 12, 2017, the Court had ordered PETA's site inspection of DCWT to take place on July 20, 2017. By July 13, 2017, they executed their plan with DCWT to have DCWT's tigers relocated before that site inspection occurred. Since PETA sent the July 14, 2017 Order (ECF No. 69) to the Wynnewood non-parties on July 17, 2017,[11] they have done nothing to try to remedy the wrong that they expressly aided and abetted DCWT in committing. Instead, they have taken and threatened to take steps to further prejudice PETA—commingling the tigers, making direct contact with them, and delighting in the possibility of breeding them, hand-rearing their young, and profiting off the exploitation of the cubs. *See* Cochran Decl., ¶ 3(c), Video 3 (9:45-10:07) (Maldonado, examining a male tiger's reproductive organs, says "we got 19 more breeders" and "we're going to populate the world") and ¶ 3(f), Video 6 (explaining that all cubs born at Wynnewood are removed from their mothers immediately after birth); ¶ 4, Exh. 1-2 at 400024-25 (Lowe confirms 17 of the DCWT tigers are of breeding age, Maldonado notes three are "pregnut" [sic], and Lowe comments that the "those cubs would feed the lot of them for a while anyway" and agrees to take them); and ¶ 5(k)-(i), Posts 11-12 (Maldonado and Lowe having direct contact with the tigers). The reason for their failure to take corrective action is obvious: they have been aiding and abetting DCWT since entry of the July 12 Order, and continue to aid and abet DCWT to this day.

### B.   Maldonado, Lowe, and Wynnewood Knowingly Aided and Abetted the Violation of the Court's Orders.

A non-party may be held in contempt for aiding and abetting if he "[knew] of the judicial decree, and nonetheless act[ed] in defiance of it" and did so "for the benefit of, or to

---

[11]    PETA first sent a copy of the July 14, 2017, Order to Lowe, Maldonado and Wynnewood on July 17, 2017. *See* Cochran Decl., ¶¶ 6-7.

assist, a party subject to the decree." *Goya Foods, Inc., v. Wallack Mgmt. Co.*, 290 F.3d 63, 75 (1st Cir. 2002). Knowledge can be established through circumstantial evidence. *Waffenschmidt v. MacKay*, 763 F.2d 711, 725 (5th Cir. 1985).

In *Waffenschmidt*, circumstantial evidence established that two out-of-state non-party contemnors had actual knowledge of a court order freezing Treasury Notes they received from MacKay, their co-conspirator, and knowingly aided and abetted MacKay in concealing those funds. Here, as in *Waffenschmidt*, there is ample evidence to establish that Maldonado, Lowe, and Wynnewood knew about and aided DCWT in knowingly violating this Court's valid orders; and there is no way to explain their involvement in this case other than as bad faith.

In *Waffenschmidt*, the court considered the non-parties' "activities relating to the disposition of the funds" to determine they had actual knowledge of the order. *Waffenschmidt*, 763 F.2d at 723-26. One factor was timing: the non-parties received the T-notes from MacKay two days after the court issued a temporary restraining order freezing the funds. *Id.* Here, Maldonado and Lowe received the tigers within days of the court orders prohibiting DCWT from moving them. *See, e.g.*, ECF No. 76-2, Tampa Bay Times at 6A (Maldonado confirmed receipt of the tigers on July 16, 2017). The court also considered the haste with which the non-parties dissipated the funds: both cashed the T-notes before their maturity date. *Waffenschmidt*, 763 F.2d at 723-26. Here, DCWT hastily transferred the tigers, in the heat of the summer and when at least one was extremely pregnant. *See* Cochran Decl., ¶ 3(d), Video 4 (cubs born in transit died) and ¶ 4, Exh. 1-2 at 400024 (Maldonado and Lowe knew three tigers were "pregnut"); and ECF No. 67-2, Exh. 10 at 14:2 (Kathy Stearns knew some of the tigers were pregnant). Maldonado and Lowe then hastily took in the tigers, rushing to raise funds and make room for the animals. *See* ECF No. 67-2, Hasbun Decl., ¶¶ 8-11 (discussing the fundraising plea).

In *Waffenschmidt*, the non-party contemnors were found to have had actual knowledge of the court's order despite the fact that they were not served with anything from the court until months after they accepted the funds they helped conceal. *Waffenschmidt*, 763 F.2d at 723-26. Likewise, Maldonado and Lowe had actual knowledge of the July 12 Order; indeed, that same day their text message exchange explicitly confirms they knew "Peta won in court today," and Maldonado has further acknowledged both to the media and to PETA that he knew DCWT wanted to get rid of the tigers to undermine the Court ordered site inspection. ECF No. 76-2 at 6A (""All I know is (Stearns) called me and asked if I could take the cats until she figured something out," Maldonado said. "Something to do with a lawsuit and PETA and she needed to get rid of her tigers.""); *see* Exh. 7, Orr Decl., ¶ 11 ("Mr. Maldonado responded that "everybody in the business" knew she was having trouble with PETA, and he knew that PETA had sued DCWT. [He] said that Kathryn Stearns told him that PETA had won in court, that there would be a site inspection of DCWT by PETA, and that she had to get rid of the tigers. [He] said he thought Kathy Stearns was embarrassed about the tigers' condition [and] that the tigers arrived at Wynnewood . . . in bad condition.").

To determine whether the non-party contemnors acted to assist MacKay in dissipating funds, the *Waffenschmidt* court considered inconsistencies in the testimony given by the non-parties and found the pair were not credible. *Waffenschmidt*, 763 F.2d at 723-26. Here, Maldonado and Lowe have been anything but consistent, raising competing stories about when, how, and why they decided to take in the tigers. On July 16, 2017, Maldonado said he arranged the transport with Kathy Stearns because of the lawsuit, ECF No. 76-2, Tampa Bay Times at 6A. The next day, he attributed the arrangement to Kathy's having grown "tired of the hassle." Cochran Decl., ¶ 6. The day after that, Maldonado said he actually made arrangements to take

15

the tigers from Kenneth Stearns, who needed to give up the tigers because he was sick. ECF No. 76-10, ¶ 2. On July 26, 2017, Maldonado again said Kathy made the arrangements, this time admitting the move occurred because PETA "won in court." Orr Decl., ¶ 11.

Lowe, meanwhile, has offered several different timelines for the transfer, including one that was demonstrably false. *See* Exh. 5 at 3-4 ("the Judge signed [the July 14 order] on Friday. The tigers were moved on Thursday.") and Cochran Decl., ¶ 4, Exh. 1-2 at 400028-31 (transfer began Friday). Lowe's dishonesty is not surprising; he is a convicted felon who defrauded a charity out of more than one million dollars in goods.[12]

Maldonado has also taken shifting positions on whether he has any interest in keeping the tigers. On July 17, 2017, he proclaimed the tigers would stay at Wynnewood "until they die of old age." Exh. 16, Sydney Grey, "Joe Exotic brings 19 new tigers to park", KXII Fox News 12, (July 17, 2017).[13] The next day, he disavowed any interest in the tigers and expressed a willingness to rehome them. ECF No. 76-10, Hasbun Decl., ¶ 2 (Maldonado voicemail) ("If you want 19 tigers, send you a semi up here, we'll load them right back up for you. Because I don't need to feed 19 tigers and I don't need to have 19 tigers. I was doing Kenneth a favor because he is sick. Other than that I don't know sh-t. I don't want to be involved in sh-t"); Cochran Decl., ¶ 8, Exh. 1-1. The next day he again said the tigers were at Wynnewood "to stay." Exh. 17, Aaron Brilbeck, "Local Zoo Takes In 19 Tigers Despite Court Order," News 9 (Jul 19, 2017).[14]

On July 26, 2017, Maldonado first stated that he would sooner kill the tigers than surrender them to the reputable facility that PETA has identified. Orr Decl., ¶ 12. Between then

---

[12]     Lowe's indictment, plea agreement and conviction are relevant and admissible pursuant to Fed. R. Evid. 609(a)(1)(A). *See* Cochran Decl., ¶¶ 9-11.

[13]     *Available at* http://www.kxii.com/content/news/Joe-Exotic-brings-19-new-tigers-to-park-435044233.html.

[14]     *Available at* http://www.news9.com/story/35925757/local-zoo-takes-in-19-tigers-despite-court-order.

and August 4, 2017, Wynnewood took the position that it would only allow for the relocation of the tigers to "facilities of [Wynnewood's] choice," provided PETA paid Wynnewood $1900 per day for "housing, feeding and vet care and the cost of relocating [the tigers] again" plus $10,000 for unloading and reloading the cats, and demanding reimbursement for caging materials. *See* Cochran Decl., ¶ 4, Exh. 1-2 at 400002 and ¶ 5(i), Post 9. Yet on August 4, 2017, the day before Lowe reiterated this ransom demand, Maldonado claimed he did not want to be involved in the dispute and was willing for PETA to take the animals, but he again said he would "euthanize them before they go to Pat Craig" at TWAS. Exh. 9, Tampa Bay Times.

Taken together, it is clear that Maldonado and Lowe will say whatever suits them best at any given time, and will do whatever they can to exploit the tigers and thwart PETA's lawsuit and the judicial process.

### C.   Federal Courts Have Inherent Power to Address Third-Party Conduct Averse to a Court's Discovery Orders.

The issue of non-parties violating a court's order most frequently arises in the context of injunctions, but courts have also addressed the issue in the context of non-injunctive orders, including, for example, violations of discovery orders. Because the July Orders at issue here are discovery orders, the approaches taken by the courts in *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186 (2d Cir. 2010), *Quinter v. Volkswagen of Am.*, 676 F.2d 969 (3d Cir. 1982), and *Hunt v. Enzo Biochem, Inc.*, 904 F. Supp. 2d 337 (S.D.N.Y. 2012) are instructive. Distilled to their essence, these cases make clear that this Court (a) has jurisdiction over out-of-state non-parties; (b) may order non-parties who have received evidence in violation of a court's discovery order to transfer that evidence elsewhere; and (c) may hold non-parties in civil contempt.

In *Eli Lilly*, drug manufacturer Eli Lilly sought and received an injunction against James Gottstein, a non-party attorney, to prevent the further dissemination and require the return of

confidential documents Gottstein had conspired to receive and disseminate in violation of a protective order entered in litigation against Eli Lilly. Eli Lilly had produced to David Egilman, the plaintiff's expert witness, confidential documents subject to the order. 617 F.3d at 189. Egilman signed the protective order, but wanted to distribute the documents to the media. Because the order prohibited him from doing so, he conspired with James Gottstein, a non-party attorney, who was not a signatory to the protective order, to evade its requirements. *Id.*

To that end, Gottstein issued a subpoena to Egilman for, among other things, the confidential documents that were subject to the protective order. *Id.* Egilman hastily produced a large volume of the protected documents to Gottstein, who then disseminated them, such that the media published a number of front-page articles based on the information therein. *Id.* Eli Lilly moved for and received an injunction barring non-party Gottstein from further disseminating the documents and ordering the documents returned to Eli Lilly. *Id.*

Here, DCWT, like Egilman, conspired with a non-party to violate a binding discovery order. Here, the non-parties, Maldonado, Lowe, and Wynnewood, like Gottstein, had actual knowledge of the discovery order and yet conspired and coordinated with the bound party to violate that order by taking possession of evidence (in this case tigers) that was encumbered thereby. Thus, here, as in *Eli Lilly*, this Court can exercise its inherent powers to order the evidence removed from the possession of the non-party co-conspirators.

In *Eli Lilly*, the Second Circuit found the district court had jurisdiction to enjoin a non-party who aided and abetted the violation of a protective order, noting among other things, that "Rule 26 neither provides nor suggests that courts lack the power to enjoin non-parties or non-signatories who aid and abet the violation of their discovery orders," and that the "relevant case law"—including *Waffenschmidt*—"is against Gottstein's position." *Id.* at 194-95. Since Eli

18

Lilly had not sought to hold Gottstein in contempt for aiding and abetting Egilman's violation of the protective order, the case's holding did not encompass that issue, but the Second Circuit nonetheless noted that "[i]f courts cannot bind third parties who aid and abet the violation of their protective orders, then any party, agent, attorney, or expert who comes into possession of material he wanted to use against the producing party could simply disseminate [it] . . . [which] would eviscerate courts' ability to manage discovery, and hence, litigation." *Id.* at 195.

Here, as in *Eli Lilly*, this Court can and should divest the non-party co-conspirators of the relevant evidence and prevent further dissemination of the tigers. Further, as the Second Circuit noted in dicta, the Court is fully empowered to order the non-parties to show cause why they are not in contempt for aiding and abetting the violation of a discovery order—something that is particularly appropriate here given the uniquely egregious nature of the conduct at issue.

In fact, this is exactly what the court did in *Quinter*, where a district court found a third party, Byron Bloch, in civil contempt for violating a protective order prohibiting the disclosure of certain documents deemed to be trade secrets by Volkswagen. 676 F.2d at 971. The district court fined Bloch, the plaintiff's consultant and expert witness, for violating that order when he provided some of the documents to another lawyer who had hired him as a consultant in another case filed against Volkswagen. *Id.*

On appeal, Bloch argued the protective order, "did not apply to him because he was only an expert witness and was neither the 'plaintiff nor his counsel' referred to in the Order." *Id.* The Third Circuit rejected that argument, noting that Bloch "need not be expressly named in the Protective Order in order to be held liable for civil contempt" because "[a] person who is not a party to a proceeding may be held in contempt if he or she has actual knowledge of a court's order and either abets the defendant or is legally identified with him." *Id.* Because the district

6170984.1

court concluded that Bloch had knowledge of the protective order (and, as the plaintiff's expert, was also legally identified with the plaintiff), the Third Circuit held that "[i]f he violated the Order, he is not immune from liability for civil contempt, even though he was not a party to the original decree." *Id.* at 973. The Third Circuit affirmed that Bloch was in contempt when he gave an attorney protected documents in violation of the discovery order. *Id.* at 974-75.

Here, as in *Quinter*, non-parties Maldonado, Lowe, and Wynnewood took possession and control over evidence subject to a discovery order. Like Bloch, DCWT's co-conspirators knew that the discovery order prohibited their actions. Here, as in *Quinter*, Maldonado, Lowe, and Wynnewood can and should be held in contempt for knowingly violating this Court's orders.

Finally, in *Enzo Biochem* the court found it had jurisdiction over out-of-state non-party Lawrence Glaser, who had assisted a party, Paul Lewicki, in removing confidential documents from Lewicki's attorney's office. 904 F. Supp. 2d at 341. Glaser's actions, taken despite a general knowledge of the existence of a protective order binding Lewicki, were sufficient to establish minimum contacts with the court's forum such that the court could reasonably order him to engage in the affirmative act of returning the confidential documents he acquired from a party in violation of that court's protective order. *Id.* at 342-43, 346. The court noted that:

> Glaser is a '[non-party] who resides outside the territorial jurisdiction' of this Court, yet he is 'subject to [this] court's jurisdiction [because he had] actual notice of the court's order,' [and] actively aid[ed] and abet[ted] a party in violation of that order. Glaser may not have known the specifics of the Protective Order, but he did know of its existence and he was aware it applied [to the parties and their counsel]. At some point, Glaser became aware that [the document were confidential, and that plaintiff and plaintiff's counsel] ha[d] violated the Protective Order by sharing them with him. Rather than returning or ceasing to use these improperly-obtained documents, Glaser exacerbated the consequences of the violation by using them [in another case]. Even now, Glaser refuses to return the documents. These actions constitute aiding and abetting [plaintiff's and plaintiff's counsel's] violation of the Protective Order. . .

6170984.1

904 F. Supp. 2d at 347. The court then ordered the return of the documents based on the court's "interest in ensuring that its orders are followed." *Id*. at 349.

Here, like Glaser, Maldonado, Lowe, and Wynnewood are out-of-state non-parties who used their resources (in this case cages at their facility) to facilitate DCWT's violation of a discovery order that they knew this Court had issued. Here, as in *Enzo Biochem*, the non-party co-conspirators subjected themselves of this Court's jurisdiction by taking steps to exercise control over and remove evidence that this Court had ordered should remain in place. Here, as there, the non-party co-conspirators have not returned or ceased to use the improperly-obtained evidence. Thus, here, as in *Enzo Biochem*, this Court can and should, out of its interest in ensuring its orders are followed, issue an order requiring Maldonado, Lowe, and Wynnewood to arrange for the immediate and permanent transfer of the tigers to TWAS.

While the *Enzo Biochem* court concluded that it had jurisdiction to order Glaser to return the confidential documents, under the facts at issue there, the court stopped shy of "imposing aiding and abetting 'liability' or 'punishing him for violating the Court's orders" because it was "less clear" whether the Court had "jurisdiction to sanction him for his past actions or otherwise find him 'liable'" because the court had not held that Glaser "violated any order of this Court." *Id*. at 347-48. The *Enzo Biochem* court made clear, though, that "should Glaser refuse to comply with his Opinion and Order, contempt and sanctions may be the next step." *Id*. at 348 n.70.

Based on the foregoing, PETA submits the Court may pursue one of two options as it relates to Maldonado, Lowe, and Wynnewood. The first option, which PETA asks the Court to pursue by this motion, is to hold them in contempt *now* for aiding and abetting the violation of this Court's July Orders, as the court did in *Quinter*. And because the Court has "wide discretion" when fashioning a remedy for civil contempt, it may then order the individuals

(Maldonado and Lowe) imprisoned for a definite period, and the entity (Wynnewood), together with the individuals, responsible for PETA's fees and costs incurred in connection with this motion, unless and until they purge themselves of that contempt by arranging for the transfer of the DCWT tigers to TWAS and pay PETA's fees and costs. If past (and current) conduct is any indicator of Maldonado's, Lowe's and Wynnewood's intent to comply with an order issued by this Court or otherwise respect the serious nature of this proceeding, PETA submits that the threat of imprisonment is the only real sanction that will cause them to obey this Court's orders.

Under the unique circumstances of this case, where DCWT has not indicated it wants the tigers back (and they should not be returned there even if DCWT did want them back), it would be a perverse remedy indeed if Maldonado, Lowe, and Wynnewood—DCWT's aiders and abettors who have proclaimed their intent to kill the tigers if they are moved to TWAS—retained the tigers. The only rational remedy is to order Maldonado, Lowe, and Wynnewood to arrange for the transfer of the tigers to TWAS, which is an established and reputable facility, and the only facility that has been identified as willing, able, and ready to accept the DCWT tigers that is not before the Court with unclean hands. The same cannot be said of Wynnewood. (ECF No. 89).

Alternatively, as a second option, the Court may, as did the courts in *Eli Lilly* and *Enzo Biochem*, simply order Maldonado, Lowe, and Wynnewood to arrange for the transfer of the tigers to TWAS, and if they refuse to do so, then take the "next step" toward contempt and sanctions. Like the confidential documents subject to the protective orders in *Eli Lilly* and *Enzo Biochem*, the tigers are evidence in this case, and this Court may direct that the evidence be transferred out of the hands of a non-party that currently possesses that evidence. But because

22

these tigers are also living, breathing beings who are capable of being harmed, a unique and special reason exists to order their transfer to ensure their safety, well-being, and protection.

**IV.    A PRESERVATION ORDER IS NECESSARY TO ENSURE THE TIGERS REMAIN ALIVE AND ARE NOT SUBJECT TO FURTHER TRANSFER PRIOR TO A RULING FROM THE COURT ON THIS MOTION.**

During the pendency of this Motion, the Court should enter an immediate preservation order to preserve the tigers. The Court has stated, "[a] federal court may issue preservation orders as part of its inherent authority to manage its own proceedings." *Arkin v. Gracey-Danna, Inc.*, No. 8:16-CV-1717-T-35AAS, 2016 WL 3959611, at *1-2 (M.D. Fla., July 22, 2016) (citing *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135-36 (Fed. Cl. 2004)). Preservation orders may be extended not only to plaintiffs and defendants, but also to third parties in possession of critical evidence. *See id.* (ordering out-of-state third party to preserve various items of evidence during the pendency of the case). The Court referenced two tests adopted by other jurisdictions in deciding whether to enter a preservation order.

First, the Court noted a two prong test "that requires the proponent to demonstrate that the order is necessary and not unduly burdensome." *Id.* Alternatively, the Court identified a three-factor balancing test, which considers: "(1) the level of concern the court has for the continuing existence and maintenance of the integrity of the evidence in question in the absence of an order directing preservation of the evidence; (2) any irreparable harm likely to result to the party seeking the preservation of evidence absent an order directing preservation; and (3) the capability of an individual, entity, or party to maintain the evidence sought to be preserved, not only as to the evidence's original form, condition or contents, but also the physical, spatial and financial burdens created by ordering evidence preservation." *Id.*

Here, a preservation order is necessary under either test to ensure that the tigers—central evidence in, and the subject matter of, this case—remain alive, not otherwise harmed, and not

6170984.1

transferred anywhere unless ordered by this Court. Indeed, it is difficult to imagine a need for a preservation order more dire, immediate, and certain than the instant case. Absent emergency interim relief, the tigers face an enhanced risk of being harmed—Maldonado, Lowe, and Wynnewood have a documented history of animal welfare violations that, in at least one recent incident, resulted in the death of an escaped tiger, (Exh. 15, USDA Inspection Report), and, even more significantly, both Maldonado and Lowe agree that the tigers should be killed prior to being moved to TWAS or any sanctuary accredited by GFAS. Orr Decl., ¶ 12; Cochran Decl., ¶ 5(b), Post 2).

The burden imposed on them by such an order is nonexistent—they already have the animals in their possession, so merely requiring them to retain such possession without injuring, killing, breeding, or transferring the animals, or separating cubs from their mothers, does not increase their burden. Further, even if a preservation order did somehow impose a burden on them, such a burden is one they voluntarily assumed when they conspired with DCWT to violate this Court's July Orders and receive the tigers in the first instance. Accordingly, the Court should issue an immediate interim preservation order requiring Maldonado, Lowe, and Wynnewood to keep the tigers on their premises and unharmed (including by refraining from breeding the animals or separating cubs from their mothers) until the resolution of this motion or further court order relocating the tigers to an appropriate sanctuary.

## V.    CONCLUSION

This Court must exercise its inherent authority and issue an order to show cause why Maldonado, Lowe, and Wynnewood should not be held in contempt of this Court's July Orders as aiders and abettors to DCWT, and when it finds them in contempt, order Maldonado and Lowe imprisoned until they purge themselves of that contempt by arranging for the immediate and permanent transfer of the tigers to TWAS and by paying PETA's attorney's fees and costs

6170984.1

relating to this motion. The Court may also simply order that they arrange for the transfer of the tigers to TWAS. Absent such an exercise of authority, Maldonado, Lowe, and Wynnewood will surely continue to escalate their interference with this litigation.

Dated: August 28, 2017                               Respectfully submitted,

*/s/ Marcos E. Hasbun*
Marcos E. Hasbun
Fla. Bar No. 0145270
Justin R. Cochran
Fla. Bar. No. 110342
Zuckerman Spaeder LLP
101 E. Kennedy Blvd., Suite 1200
Tampa, FL 33602
Tel: (813) 221-1010
Fax: (813) 223-7961
mhasbun@zuckerman.com
jcochran@zuckerman.com

**Trial Counsel for People for the Ethical Treatment of Animals, Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of August, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system. Additionally, on August 28, 2017, I have sent by Federal Express a copy of the DVD referenced in Justin Cochran's Declaration to Defendants' counsel.

*/s/ Marcos E. Hasbun*
Marcos E. Hasbun

6170984.1